UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                               :

LEO ROSENSON,                            :

                      Plaintiff,     :

                                   :             11 Civ. 6145 (JPO)

            -against-            :

                                   :        MEMORANDUM AND

ABRAHAM M. MORDOWITZ et al.,     :            ORDER

                  Defendants.  :

                                   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiffs Leo Rosenson and Dora Bergstein, as the Executor of the Estate of Jack

Bergstein ("Plaintiffs"), initiated this action in the Supreme Court of the State of New York,

County of New York.  Defendants Abraham M. Mordowitz , 1030 Carroll St. Corp., Victor

Mordowitz, Marlene Mordowitz, and the Mordowitz Family Limited Partnership ("Defendants")

removed the action to this Court on September 1, 2011.  On September 30, 2011, Plaintiffs filed

an Amended Complaint against Defendants asserting two claims for violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, against distinct

RICO enterprises, in addition to various state law claims.  Plaintiffs' claims stem from the

allegation that Abraham Mordowitz siphoned funds from a bank account connected to a property

in Brooklyn that he was charged with managing.

      Defendants have moved to dismiss the first, second, third, fourth, and eighth causes of

action of Plaintiffs' Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal

Rules of Civil Procedure.  In addition, Plaintiffs and Defendants have each moved separately for

Rule 11 sanctions.  The Court heard oral argument on the motions on August 21, 2012.

For the reasons set forth below, Defendants' motion to dismiss the first and second causes of action is granted. The Court declines to exercise pendent jurisdiction over the remaining state law claims and remands this matter to New York Supreme Court. Both Defendants' and Plaintiffs' motions for sanctions are denied.

## I.     Background

The following facts are taken from the Amended Complaint and are presumed true for purposes of this motion.

The dispute arises from the management of a multiunit apartment building at 1030 Carroll Street, Brooklyn, NY (the "Property"). The Property is owned as a tenancy in common. (Amended Complaint, Dkt. No. 9 ("Compl.") at ¶ 16.) Plaintiffs, the Bergstein Estate and Leo Rosenson, each own a 25% share in the Property, or 50% jointly. (*Id.* at ¶ 17-18.)[1] The remaining 50% is owned collectively by parties who have been named as nominal defendants in this action, Victor Mordowitz, Marlene Mordowitz, and the Mordowitz Family Limited Partnership. (*Id.* at ¶ 19.)

Abraham M. Mordowitz is a New York real estate attorney and partner at the law firm of Mordowitz & Lemberg LLP ("M&L"). Abraham Mordowitz has managed the Property since approximately June 2005. Prior to Abraham Mordowitz's tenure as property manager, between 1998 and 2004, the Property was managed by Abraham Mordowitz's father and then briefly by his mother. (*Id.* at ¶ 22.)

Nominal Defendant Victor Mordowitz is a close relative of Abraham Mordowitz, and

---

[1] Leo Rosenson is in his eighties and resides in Kings County, New York.

Nominal Defendant Marlene Mordowitz is the wife of Abraham Mordowitz.  (*Id.* at ¶ 10, 11.)
They are both New York residents.  (*Id.*)  The Mordowitz Family Limited Partnership is a New
York limited partnership.  (*Id.* at 14.)

Abraham Mordowitz managed and controlled the Property pursuant to a management
agreement (the "Management Agreement").  His services included making recommendations
with respect to significant capital expenditures, retaining contractors, supervising repair and
maintenance, collecting rent, and maintaining an agency bank account (the "Agency Account").
(*Id.* at ¶ 26-27.)  As compensation for managing the Property, Abraham Mordowitz has collected
a management fee equal to six percent of the gross annual rents for the Property, payable from
the Agency Account.  The Management Agreement is terminable at will by the owners of the
Property.  (*Id.* at ¶ 32.)

Under the Management Agreement, all of the income and monetary assets of the Property
were to be deposited into the Agency Account, and expenditures for the benefit of the Property
were to be made from the Agency Account.  (*Id.* at ¶ 28.)  The Agency Account is registered in
the name of Defendant 1030 Carroll St. Corp. ("1030 Corp.").  (*Id.* at ¶ 29.)

1030 Corp. was formerly a closely and privately held New York corporation with a
principal place of business in Queens County, NY.  In 1993, it was dissolved by proclamation of
the New York Secretary of State, but continues to operate.  (*Id.* at ¶ 6.)  Abraham Mordowitz has
been the Vice President of 1030 Corp. at all times relevant to this action.  (*Id.* at ¶ 7.)  At some
point, Abraham Mordowitz, as Vice President of 1030 Corp., signed a deed to the Property
pursuant to which the "numerous parties" obtained their status as tenants in common, although it
is not clear from the Amended Complaint whether this occurred before or after 1030 Corp.'s

3

dissolution.  (*Id.* at ¶ 7.)  The Agency Account has been in the name of 1030 Corp. and under the control of Abraham Mordowitz as long as he has managed the Property.  (*Id.* at ¶¶ 29-30.)

Abraham Mordowitz is alleged to have knowingly misappropriated funds from the Agency Account.  (*Id.* at ¶¶ 48-49.)  In connection with the misappropriation, Abraham Mordowitz sent or caused to be sent Operating Statements via U.S. Mail from 2006 to 2011 on March 31st of each year containing false and inflated statements about expenses related to the Property.  (*Id.* at ¶¶ 44-45.)  The fraudulent Operating Statements were prepared by an accountant who relied on data obtained from the Agency Account.  (*Id.* at ¶ 87.)

In the amended complaint, Plaintiffs provide several reasons why they believe that the expenses, as reflected in the Operating Statements, are inflated.  (*Id.* at ¶ 46.)  When Rosenson's son-in-law demanded documentation to support the expenditures disclosed in operating statements, Abraham Mordowitz provided bills that failed to indicate the location of the expenditures.  (*Id.* at ¶ 46(a).)  No significant renovations were apparent despite the high levels of purported expenditures.  (*Id.* at ¶ 46(b).)  Abraham Mordowitz failed to apply to increase the rent as a result of the purported expenditures pursuant to 9 N.Y.C.R.R. § 2522.4.  (*Id.* at ¶ 46(c).)  There was a precipitous increase in the annual ratio of total expenses associated with the Property to rental income of the Property during Abraham Mordowitz's tenure as property manager.  (*Id.* at ¶ 46(d).)

With regard to Abraham Mordowitz's law firm, M&L, Plaintiffs allege that Abraham Mordowitz used M&L's fax machine to send a fax from the office to Rosenson in Florida on

March 31, 2006; the fax contained a copy of the 2005 Operating Statement. (*Id.* at ¶¶ 63, 56.)[2] Abraham Mordowitz periodically received phone calls from Rosenson at M&L's offices and sometimes met with Ronsenson at M&L's offices to discuss the Property. On more than one occasion, Rosenson's call to Abraham Mordowitz was answered by a secretary who connected Rosenson to Abraham Mordowitz if he was available. (*Id.* at ¶¶ 65, 74.) On April 6, 2009, in response to a request made by Kerry Gotlib, Esq. (counsel to Rosenson and the Bergstein Estate), a secretary prepared a letter at M&L's offices, using M&L stationery, which was mailed to Gotlib on April 6, 2009; this letter enclosed a copy of the 2008 Operating Statement, which, like the other Operating Statements, contained fraudulent representations. (*Id.* at ¶ 55(a)). Abraham Mordowitz also maintained files concerning the management of the Property at M&L's offices. (*Id.* at ¶ 55(b).)

As the "RICO person," Abraham Mordowitz is alleged to have committed acts of mail fraud by using the U.S. mail to send fraudulent operating statements to Plaintiffs annually from 2006 to 2011. It is further alleged that Abraham Mordowitz committed wire fraud by faxing or causing to be faxed a fraudulent Operating Statement for the year 2006 from M&L's offices in New York to Plaintiff Rosenson in Florida. (*Id.* at ¶¶ 40, 44, 67.)

## II.    Legal Standard for Motion to Dismiss

To survive a motion to dismiss, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570

---

[2] Plaintiffs also allege that Abraham Mordowitz used M&L's fax machine on March 31, 2007 and March 31, 2008 to fax misleading Operating Statements for the years 2006 and 2007, respectively, to Rosenson within the state of New York. However, Plaintiffs allege only that the fax sent outside of New York constitutes wire fraud.

(2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, ---, 129 S.Ct. 1937, 1949 (2009).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted).  Where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.

The Court must accept as true all well-pleaded factual allegations in the complaint and "draw [ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal citations omitted).  On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S.Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

Additionally, claims sounding in fraud must meet Rule 9(b)'s heightened pleading standard.  *See* Fed.R.Civ.P. 9(b).  To comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular*

6

*Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Rule 9(b) provides that "intent, knowledge, and other conditions of a person's mind may be averred generally."

## III.    The RICO Statute

### A.    Definition of RICO

Congress enacted RICO in 1970 as part of the Organized Crime Control Act "to seek the eradication of organized crime in the United States."  Pub.L. No. 91–452 (1970).  Pursuant to the statute, it is "unlawful for any person employed or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

To state a plausible civil claim for violation of RICO § 1962(c), Plaintiffs' pleadings "must demonstrate, as to each defendant, that while employed by or associated with an enterprise engaged in interstate or foreign commerce, and through the commission of at least two predicate acts constituting a 'pattern of racketeering,' the defendant directly or indirectly conducted or participated in the conduct of the affairs of such enterprise."  *Gross v. Waywell*, 628 F. Supp. 2d 475, 485 (S.D.N.Y. 2009) (citing 18 U.S.C. § 1962(c); *Spool v. World Child Int'l Adoption Ag.*, 520 F.3d 178, 183 (2d Cir. 2008)).  The specific predicate acts that constitute racketeering activity are enumerated in the statute and include mail fraud (§ 1341) and wire fraud (§ 1343). *See* 18 U.S.C. § 1961(1).[3]

---

[3] Allegations merit particular scrutiny where, as here, the predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion. *See, e.g.*, *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000) ("We note that courts, including our own, have suggested that RICO claims premised on mail or wire fraud must be particularly scrutinized

The Supreme Court has noted that "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'"  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citing § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961).  The true civil RICO plaintiff may well provide a laudatory societal service, supplementing the government's efforts "to protect the general public and the common good from felonious conduct."  *Gross*, 628 F. Supp. 2d at 481 (citing *Agency Holdg. Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 151 (1987)).  Yet, all too frequently, plaintiffs attempt to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act.  Many courts have noted that the allure of treble damages, attorney's fees, and federal jurisdiction presents a powerful incentive for plaintiffs to attempt to fit "garden variety fraud" claims within the standard of civil RICO.  *See, e.g.*, *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000) ("I surmise that every member of the federal bench has before him or her at least one— and possibly more—garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages. . . ."); *Gross v. Waywell*, 628 F. Supp. 2d at 481 ("[E]xperience reveals that many plaintiffs, rather than fostering RICO's mission as private attorneys general aiding public law enforcement, actually appear as private prospectors digging for RICO's elusive gold, and more often than not generating substantial costs rather than net gains to the public."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Archway Ins. Services*

---

because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."); *Gross*, 628 F. Supp. 2d at 482  ("Exercise of federal court jurisdiction in . . . cases . . . that rely on nothing more than incidental use of mails or wires in furtherance of a simple fraudulent scheme with few victims and narrow impacts, would threaten to federalize garden-variety state common law claims, and offer a remedy grossly out of proportion to any public harm or larger societal interests associated with localized wrongful conduct ordinarily involved in such actions.").

*LLC*, No. 11 Civ. 1134 (WHP), 2012 WL 1142285, at *3 (S.D.N.Y. Mar. 23, 2012).

Consequently, courts have an obligation to scrutinize civil RICO claims early in the litigation—to separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud.  "Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991); *see also Goldfine*, 118 F. Supp. 2d at 394 ("[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." (internal citation and quotation marks omitted)).

### B.      RICO Enterprise

 "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity."  18 U.S.C. § 1961(4).  Thus, the RICO enterprise may be a lawful entity or an association-in-fact.  "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Section 1962(c) prohibits the RICO person from conducting the "enterprise's affairs through a pattern of racketeering activity."  *See also Reves v. Ernst & Young*, 507 U.S. 170, 182

9

(1993) ("Members of Congress understood § 1962(c) to prohibit the operation or management of an enterprise through a pattern of racketeering activity. . . ."). Thus, there must be a meaningful connection between the defendant's racketeering acts and the affairs of the enterprise. *Massaro v. United States*, No. 97 Civ. 2971, 2004 WL 2251679, at *5 (S.D.N.Y. Oct. 5, 2004), *aff'd*, 152 F. App'x 20 (2d Cir. 2005). In other words, the "defendant must have conducted or participated in the enterprise by engaging in the pattern of racketeering." *Id.*; *see also Elsevier Inc. v. W.H.P.R., Inc.*, 692 F.Supp. 2d 297, 308 (S.D.N.Y. 2010) ("The Complaint . . . must allege facts tending to show that the affairs of each of the pleaded enterprises were conducted through a pattern of racketeering activity.").

In addition, to state a cause of action for RICO in the Second Circuit, the "pattern of racketeering activity" must satisfy a relatedness requirement.[4] "The requirement of 'relatedness' embodies two different concepts. The racketeering acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (quoting *United States v. Long*, 917 F.2d 691, 697 (2d Cir. 1990)). "Vertical relatedness means that the acts are related to the enterprise." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 251 (2010), and *cert. denied*, 131 S. Ct. 953 (2011). "To show that the predicate acts are vertically related to the RICO enterprise, the government must establish (1) that the defendant

---

[4] The term "vertical relatedness," now a staple of Second Circuit RICO jurisprudence, was first coined by Judge Winter in *United States v. Long*, 917 F.2d 691, 697 (2d Cir. 1990). The concept, along with that of "horizontal relatedness," informs whether a "pattern of racketeering activity" exists for purposes of the RICO statute. For vertical relatedness to exist, the racketeering acts must relate to the conduct of the affairs of the RICO enterprise. This is closely connected to the requirement that the RICO person conduct the "enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

10

'was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise,' or (2) that 'the predicate offenses are related to the activities of that enterprise.'"  *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (quoting *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992)).  Horizontal and vertical relatedness are generally satisfied by linking each predicate act to the enterprise. *Burden*, 600 F.3d at 216.  In other words, "the requisite vertical nexus exists if either the racketeering activity is carried out in furtherance of the enterprise or the defendant has relied on his or her position in the enterprise to commit the acts."  *United States v. Indelicato*, 865 F.2d 1370, 1375 (2d Cir. 1989) (citing *United States v. LeRoy*, 687 F.2d 610, 616-17 (2d Cir. 1982), *cert. denied,* 459 U.S. 1174 (1983); *United States v. Scotto*, 641 F.2d 47, 53-55 (2d Cir. 1980), *cert. denied,* 452 U.S. 961 (1981)).

## IV.   Application of Law to the Allegations

The central question at issue here is whether Plaintiffs have plausibly alleged facts sufficient to demonstrate that an "enterprise" exists for the purposes of RICO.  Plaintiffs have hypothesized two alternative RICO enterprises.[5]  As their first cause of action, Plaintiffs assert that M&L, the law firm where Abraham Mordowitz practices real estate law, is the RICO enterprise.  As the second cause of action, Plaintiffs assert that the RICO enterprise is 1030 Corp., which, although formally dissolved in 1993, maintains the Agency Account in its name. As detailed below, the Court concludes that Plaintiffs have not pleaded facts sufficient to allege

---

[5] Although Defendants point out that Plaintiffs' allegations regarding the two distinct RICO enterprises are inconsistent, Plaintiffs rely on Federal Rule of Civil Procedure 8(d)(3), which provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency."

that either M&L or 1030 Corp. is a RICO enterprise that was engaged in a pattern of racketeering activity.

### A.    Plaintiffs' First RICO Cause of Action

Defendants argue that Plaintiffs have not alleged facts sufficient to demonstrate that M&L is a RICO enterprise as defined in § 1961(4).  They contend that the Amended Complaint is devoid of allegations that M&L conducted its affairs through a pattern of racketeering activity and that the requisite element of vertical relatedness is absent.

At their core, the relevant allegations in the Amended Complaint with respect to M&L are that Abraham Mordowitz used his authority as a partner at the law firm to commit some of the firm's resources to the commission of racketeering activity, sending fraudulent statements about the Property by mail and wire.  The resources utilized in connection with alleged fraud include M&L's fax machine on a few occasions, M&L's stationery and secretarial services on one occasion, M&L's offices as a location to discuss the Property with Rosenson in person on a few occasions, and M&L's telephones and receptionist services to receive phone calls from Rosenson.  In addition, it is alleged that Abraham Mordowitz maintained files related to the management of the Property at M&L.

Plaintiffs argue that both independently sufficient tests for vertical relatedness are satisfied because (1) Abraham Mordowitz was able to commit the predicate acts solely by virtue of his control over M&L and (2) the mail and wire fraud are related to the M&L's activities.  *See Daidone*, 471 F.3d at 375.  Consequently, according to Plaintiffs, it has been alleged that the

affairs of M&L were conducted through a pattern of racketeering activity.[6]

Since the allegations pertain to the use of M&L's resources, including its facilities, the pertinent inquiry is whether, and to what extent, the use of the resources of an enterprise in connection with racketeering activities is sufficient to convert that entity into a RICO enterprise. This issue has not been directly addressed by the Second Circuit.

Plaintiffs rely on two cases from the First Circuit and a case from the Fourth Circuit to argue that vertical relatedness is satisfied when the resources of the RICO enterprise are used in furtherance of the racketeering acts.  In *United States v. Marino*, the First Circuit held that "the 'through' requirement connecting the predicate act to the enterprise" is met "when the resources, property, or facilities of the enterprise are used by the defendant to commit the predicate acts." 277 F.3d 11, 28 (1st Cir. 2002) (citing *United States v. Grubb*, 11 F.3d 426, 439 (4th Cir. 1993)). In *Marino*, the court concluded that the coconspirators' positions within a mafia network, the Patriarca Family, facilitated their commission of a drug trafficking conspiracy.  277 F.3d at 28. Plaintiffs also rely on *United States v. Brandao*, 539 F.3d 44 (1st Cir. 2008).  In *Brandao*, the First Circuit concluded that a gun, which had been used by different actors in various murders, was a resource shared among associates and that this was sufficient to allow the jury to find that a nexus existed between an association-in-fact enterprise and the predicate acts of murder.  *Id.* at 54.  In *United States v. Grubb*, 11 F.3d 426, 439-40 (4th Cir. 1993), the Fourth Circuit held that a judge's use of judicial resources, including the "power and prestige of [his] office," placed the

---

[6] For vertical relatedness to exist, the racketeering acts must relate to the conduct of the affairs of the RICO enterprise.  As noted above, this is closely connected to the requirement that the RICO person conduct the "enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Moreover, the RICO person's connection to the enterprise must be pivotal to the commission of the predicate acts.

judge in a position to perform the racketeering activities stemming from a campaign fraud

scheme.  Thus, Plaintiffs argue that the use of M&L's resources by the RICO person, Abraham

Mordowitz, is sufficient to establish a vertical nexus between the racketeering activity and M&L,

the RICO enterprise.

The analysis employed in the First and Fourth Circuits to ascertain the existence of a

RICO enterprise, however, is distinct from horizontal and vertical relation analysis used in the

Second Circuit.[7]  The Second Circuit has not yet directly addressed whether, or when, the use of

resources of an entity is significant enough to transform that entity into a RICO enterprise for

purposes of the RICO statute.  It is beyond doubt that in certain circumstances the use of an

enterprise's resources may be central to the commission of the racketeering activities such that

the use could transform a legitimate enterprise into a RICO enterprise for the purposes of the

statute.  Regardless, this Court concludes that this is not the case here, where the resources

allegedly involved are as ubiquitous and commonplace as a fax machine and a mail drop.  There

is something fundamentally different about a judge co-opting the "power and prestige" of his

office, *Grubb*, 11 F.3d at 439-40, or a mobster using his status within a crime family, *Marino*,

277 F.3d at 28, in furtherance of racketeering acts, when compared to a lawyer/property manager

using the fax machine and other standard office equipment as part of the alleged fraudulent

mismanagement of Property.  There is nothing about the use of the particular resources alleged

that is crucial to the pattern of racketeering activities, nor is there any special connection between

---

[7]  A helpful student note observes that the  Second,Third, and Sixth Circuits employ a similar vertical relatedness test while other circuits, including the First and the Fourth, have not expressly adopted this approach.  *See*, Colman D. McCarthy, Note, *Criminal Relationships: Vertical and Horizontal Relatedness in Criminal Rico*, 86 WASH. U.L. REV. 1493, 1508 (2009).

the enterprise and the resources.  It is also worth noting that Abraham Mordowitz would not have been hindered in the commission of the alleged acts of wire and mail fraud without access to M&L's resources or facilities.  Here, the fraudulent acts could have just as well been committed in any other office with standard office supplies.  The fact that M&L's resources were used is merely incidental.

While Abraham Mordowitz may have been able to use M&L's resources solely by virtue of his position at the law firm, the use of those resources was not indispensable to the alleged racketeering activities.  Thus, it has not been alleged, nor is it plausible, that Abraham Mordowitz was capable of conducting his racketeering activities *solely* by virtue of his position in the law firm.

The second consideration in the vertical relatedness analysis—that "the predicate offenses [be] related to the activities of that enterprise"—is likewise not met.  *United States v. Daidone*, 471 F.3d at 375.   M&L is a law firm.  There is no allegation that any part of the business of M&L involved the management of property, fraudulently or otherwise, or that the fraudulent management of the property, the mail fraud, or the wire fraud furthered the affairs of M&L in any way.  Likewise, there is no allegation that anyone at M&L apart from Abraham Mordowitz participated in the fraud or benefitted from the fraud.  *See Elsevier*, 692 F.Supp. 2d at 308 (dismissing claim because plaintiffs failed "to connect the fraud to the affairs of the enterprise" where there were no specific allegation that the alleged RICO enterprise participated in the fraud directly or realized any portion of the illicit profits from the scheme); *see also United States v. Persico*, No. 92 Cr. 00351, 1994 WL 36367, at *6 (E.D.N.Y. Jan. 28, 1994) ("Thus the link between the predicate acts and the enterprise must be a strong one: 'no RICO violation can

15

be shown unless there is proof of the specified relationship between the racketeering acts and the RICO enterprise.'" (quoting *Indelicato*, 865 F.2d at 1384)).

The siphoning of some of the resources of an enterprise for an illegitimate purpose does not, without more, expand that purpose of the business. Not every fraudulent fax sent from an office has the power to transform a business into a RICO enterprise. There is still a requirement that the racketeering acts must be committed in furtherance of the enterprise's affairs. *See*, *e.g.*, *Minicone*, 960 F.2d at 1106 (concluding that because the vertical nexus was present the RICO person acted "in furtherance of the enterprise's affairs" in participating in a stolen goods operation and in a murder); *Burden*, 600 F.3d at 216 (requiring proof "both that an enterprise exists and that the conduct *in furtherance of the enterprise* comprises a pattern" (emphasis added)).

A recent case from the Third Circuit is instructive. Judge Scirica observed:

> the allegation that defendants took advantage of an opportunity to meet provided by a legitimate enterprise in the normal course of its business does not mean—or plausibly imply—that defendants were participating in the conduct of the enterprise. . . . If it did, any coffee house or hotel with conference facilities could . . . be made into a RICO enterprise merely by dint of the fact that racketeers used the facility as a meeting place. In our view, such an expansive interpretation of § 1962(c) liability would not comport with the text or purpose of the RICO statute. . . . [W]e do not think a RICO violation occurs simply because an enterprise provides goods or services that ultimately benefit a defendant's racketeering efforts; in order to constitute a § 1962(c) violation, it is necessary that the defendant, in utilizing these goods or services, "participate . . . in the conduct of [the] enterprise's affairs." § 1962(c).

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 380-81 (3d Cir. 2010).

Here, Plaintiffs have not adequately alleged that the affairs of M&L were conducted through a pattern of racketeering activity, or that the alleged mail and wire fraud was related to M&L's affairs.  There is no plausible allegation that Abraham Mordowitz furthered the affairs of the law firm by mailing and faxing the Operating Statements to Plaintiffs.

Accordingly, Plaintiffs' first cause of action in the Amended Complaint will be dismissed.

### B.    Plaintiffs' Second RICO Cause of Action

As their second cause of action, Plaintiffs assert that 1030 Corp., and not M&L, is the RICO enterprise.  (Compl. at ¶ 83.)  Defendants move to dismiss this cause of action, arguing that 1030 Corp. cannot be a RICO enterprise as it is not distinct from Abraham Mordowitz, the RICO person.

As discussed above, 1030 Corp. was dissolved by the New York Secretary of State in 1993.[8]  Nevertheless, Plaintiffs allege that 1030 Corp. continues to operate, that the Agency Account is in its name, and that Abraham Mordowitz is its vice president.  The Amended Complaint contains no allegations concerning business conducted by 1030 Corp. or other individuals associated with the enterprise.

It is axiomatic that a RICO person cannot associate with himself and be both the RICO defendant and the RICO enterprise.  *See McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) ("[Y]ou cannot associate with yourself, any more than you can conspire with yourself, just by

_____

[8] Although it is not alleged in the Amended Complaint, both parties acknowledge that 1030 Corp. was dissolved as a result of its failure to pay its franchise taxes.  (Def. Opp. at 9, Dkt. No. 18; Pl. Mem. at 5, Dkt. No. 16.)

giving yourself a *nom de guerre*.").  There must be distinctiveness between the RICO person and the RICO enterprise.  *See Cedric*, 533 U.S. at 161; *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) ("The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise." (internal citations and quotation marks omitted)).

Nevertheless, the Supreme Court has established that a corporation, even if wholly owned by a single individual, may be an enterprise for the purposes of RICO.  *Cedric*, 533 U.S. at 163 (holding that a sole proprietor can associate with his corporation in furtherance of racketeering activities).  This is because once incorporated, an enterprise receives "some legal protections from the corporate form, such as limited liability; and it is just this sort of legal shield for illegal activity that RICO tries to pierce."  *McCullough*, 757 F.2d at 144.

Once dissolved, however, a former corporation no longer may benefit from the protections of the corporate form in New York.  *See Moran Enterprises, Inc. v. Hurst*, 66 A.D.3d 972, 975, 888 N.Y.S.2d 109 (2d Dep't 2009) ("Upon dissolution, the corporation's legal existence terminates. . . .  A dissolved corporation is prohibited from carrying on new business." (citations omitted)); *41 E. 1st St. Rehab Corp. v. Lopez*, 892 N.Y.S.2d 847, 851 (Civ. Ct. 2009) ("Once a corporation has been dissolved by proclamation for failure to pay taxes, absent subsequent reinstatement, the corporation is legally dead, and is no longer permitted to sue or be sued, except as specifically permitted by statute.")  Defendants, however, argue that a dissolved corporation is recognized as a *de facto* corporation under New York law where it continues to operate after its dissolution.  *See L-Tec Electronics Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 87 (2d Cir. 1999) ("[W]e see convincing signs in New York case law that a company

18

dissolved for failure to pay franchise taxes can be considered a *de facto* corporation."); *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, No. 99 Civ. 9623, 2007 WL 1040809, at *18 (S.D.N.Y. Apr. 4, 2007), *aff'd, Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433 (2d Cir. 2009) (noting that "a contract entered into after dissolution had been held enforceable" by the New York state courts) (citations omitted)).  Defendants also rely on a case from the United States District Court from the Northern District of Illinois concluding that the plaintiff stated a plausible RICO claim where it alleged that the RICO person operated a dissolved corporation "as though it were a legitimate business, even though the company had dissolved involuntarily sometime prior to the scheme."  *Select Medical Corp. v. Cash Flow Consultants, Inc.*, No. 09 C 8066, 2010 WL 5627983, at *1 (N.D. Ill. Nov 17, 2010).

The Court need not resolve whether a New York corporation, dissolved for its failure to pay franchise taxes but continuing to operate as a *de facto* corporation, retains a legal identity sufficiently distinct from its "vice president" such that it can be a RICO enterprise.  Plaintiffs' allegation that 1030 Corp. "continues to operate" is no more than a conclusory statement. (Compl. at ¶ 6.)  Where courts have recognized the *de facto* status of a dissolved corporation, that corporation has transacted *some* specific business or continued to operate as though it had never been dissolved.  Here, Plaintiffs have not pleaded facts in the Amended Complaint sufficient to show that 1030 Corp. conducted any business, legitimate or otherwise. Consequently, the continued operation of 1030 Corp. as a *de facto* corporation has not been adequately alleged.  As a result, Plaintiffs may not rely on the 1030 Corp.'s former corporate identity or status as a *de facto* corporation to demonstrate that it retains an identity distinct from Abraham Mordowitz.

19

It is true that a RICO enterprise need not be a lawful entity.  *See* 18 U.S.C. § 1961(4) (A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, *and any union or group of individuals associated in fact, although not a legal entity*" (emphasis added)).  Indeed, many criminal organizations operate as RICO entities even though they are little more than loosely organized, non-hierarchical groups.  *See Boyle*, 556 U.S. at 949; *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 422 (E.D.N.Y. 2007) ("A RICO enterprise can be a legal entity or a discrete economic association existing separately from the racketeering activity." (internal quotation marks and citation omitted)).  Thus, it is possible for an enterprise such as 1030 Corp., which was not incorporated at the time of the commission of the racketeering acts, to be a RICO enterprise *if* it continues to operate as an "association-in-fact."  The crucial aspect of these association-in-fact entities, however, is that they must have more than one member to operate as a RICO enterprise.

As Judge Posner explained in *McCullough v. Suter*: "The only important thing is that [the RICO enterprise] be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual."  757 F.2d at 144; *see also City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 448-49 (2d Cir. 2008), *rev'd and remanded on other grounds*, *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) (adopting *McCullough* approach in the Second Circuit).  Thus, it is crucial, in both the case of the legal enterprise and the association-in-fact enterprise, that the enterprise maintains an identity distinct from the RICO person.  The RICO person is generally distinct from the sole proprietorship enterprise, unless the sole proprietor is "strictly a one-man

show." *McCullough*, 757 F.2d at 144.  If the RICO enterprise is not "separable from the individual," the claim cannot be maintained.  *Id.*

      Here, 1030 Corp. is neither a legal entity nor an association-in-fact.  Abraham Mordowitz is the only alleged associate of the dissolved corporation.  Although the allegation that Abraham Mordowitz is 1030 Corp.'s vice president could suggest that 1030 Corp. at one point had other officers, this allegation does not show that Abraham Mordowitz associated with anyone else in conducting the affairs of an enterprise through a pattern of racketeering activity.  Moreover, the existence of a bank account under the name of 1030 Corp. does not establish that 1030 Corp. is a RICO enterprise distinct from Abraham Mordowitz as the RICO person.  The fact that the name on the Agency Account was never altered after the corporation was dissolved is not sufficient to show that the corporation maintained a distinct legal identity.  Furthermore, it is not alleged that 1030 Corp. has any purpose or conducts any business currently.  *See Boyle*, 556 U.S. at 946 ("That an 'enterprise' must have a purpose is apparent from the meaning of the term in ordinary usage, i.e., a 'venture,' 'undertaking,' or 'project.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 757 (1976)).  Thus, the allegations in the complaint, even construed in the light most favorable to Plaintiffs, support only the conclusion that Abraham Mordowitz acted alone.  The Court concludes that 1030 Corp. fails as an alleged RICO enterprise because it is not distinct from Abraham Mordowitz as the alleged RICO person.

      In addition, Plaintiffs have not alleged facts sufficient to show that the affairs of 1030 Corp. are vertically related to the alleged racketeering act.  *See, e.g.*, *Burden*, 600 F.3d at 216 ("Vertical relatedness . . . requires that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's

affairs, or because the offense related to the activities of the enterprise.").   There is no suggestion that Abraham Mordowitz was able to commit the mail and wire fraud "solely" by virtue of his position at 1030 Corp. or that the acts of mail and wire fraud furthered, or were in any way related to, the affairs of 1030 Corp.  In fact, there is no allegation supporting the proposition that 1030 Corp. had any affairs at all.

While it is alleged that the Agency Account was in the name of 1030 Corp., and the deposits into and out of the Agency Account may relate to the underlying alleged fraud, it does not follow that Abraham Mordowitz was able to commit the alleged acts of mail and wire fraud solely because he was the vice president of 1030 Corp. or had access to the resources of 1030 Corp.  It seems obvious that Abraham Mordowitz had access to the Agency Account because he had been contracted as a property manager for the Property, not because he was coincidentally vice president of a dissolved corporation.  It has not been adequately alleged that Abraham Mordowitz's status as vice president of 1030 Corp. was relevant to the alleged acts of mail or wire fraud.   Thus, the allegations in the Amended Complaint, even when considered in the light most favorable to Plaintiffs, do not support the conclusion that 1030 Corp.'s affairs were conducted through a pattern of racketeering activity.

Accordingly, Plaintiffs' second cause of action must be dismissed.

## V.      Supplemental Jurisdiction

Plaintiffs' remaining causes of action all arise under state common law.  Federal jurisdiction rested solely on Plaintiffs' RICO claims.  Now that those claims are dismissed, this Court may decline to exercise supplemental jurisdiction over the remaining claims.  See 28 U.S.C. § 1367(c)(3).

While the decision as to whether to exercise supplemental jurisdiction is within the court's discretion, courts should generally decline to exercise jurisdiction over remaining state claims that do not implicate preemption issues where federal claims are dismissed in the early stages of litigation.  *See Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").  Because this action is in its early stages, this Court declines to exercise jurisdiction over Plaintiffs' remaining claims and remands this matter to New York Supreme Court, New York County.

## VI.    Sanctions

Both Plaintiffs and Defendants have moved pursuant to Rule 11 of the Federal Rules of Civil Procedure for sanctions against the opposing parties.  Each party asserts that its adversary's position is so frivolous that sanctions are merited.  Defendants argue that Plaintiffs' RICO claims "could never succeed under any application of existing RICO jurisprudence (nor any reasonable extension thereof."  (Def. Rule 11 Mem. at 2, Dkt. No. 26.)  Plaintiffs, on the other hand, argue that "Defendants' Rule 11 Motion is itself so utterly devoid of merit that it invites sanctions so as to deter Defendants in the future by encouraging them to 'stop and think' before engaging in similar misconduct."  (Def. Rule 11 Opp. at 5-6, Dkt. No. 29.)  Each side requests that the other pay its attorney's fees and costs in connection with this matter.

The purpose of Rule 11 is to "deter baseless filings in district court . . . and streamline the administration and procedure of the federal courts."  *Cooter & Gell v. Martmarx Corp.*, 496 U.S. 384, 393 (1990).  Rule 11 establishes "a means by which litigants certify to the court, by

23

signature, that any papers filed are well-founded." *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 542 (1991).  Rule 11 imposes on each person who signs a court document "an affirmative duty . . . to conduct a reasonable inquiry into the viability of a pleading" before signing it.  *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990).  If the certification required under Rule 11(b) is violated, courts are authorized to impose appropriate sanctions against the signer.  *See* Fed.R.Civ.P. 11(c).

      "As numerous courts in this Circuit have recognized, Rule 11 is particularly significant in the civil RICO context 'because commencement of a civil RICO action has an almost inevitable stigmatizing effect on those named as defendants.'"  *Edmonds v. Seavey*, No. 08 Civ. 5646, 2009 WL 4404815, at *3 (S.D.N.Y. Dec. 2, 2009) (quoting *Hoatson v. New York Archdiocese*, No. 05 Civ. 10467, 2007 WL 431098, at *9 (S.D.N.Y. Feb. 8, 2007)).  Thus, "courts have not hesitated to impose sanctions under Rule 11 when RICO claims have been found to have been frivolous."  *Id.* (quoting *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 02 Civ. 2561, 2003 WL 22227956, at *13 (S.D.N.Y. Sept. 26, 2003)).

      The Court, however, does not conclude that the position of either party is so frivolous as to warrant the imposition of sanctions.  Accordingly, the parties' cross-motions for sanctions are denied.

## VII.   Conclusion

      For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED in part, and the first and second causes of action (alleging RICO violations) are hereby DISMISSED.  Defendants' motion for sanctions is DENIED.  Plaintiffs' motion for sanctions is also DENIED.  This case is hereby REMANDED to New York Supreme Court.

The Clerk of Court is directed to close the motions at docket numbers 14 and 24 and to remand this matter to New York Supreme Court, New York County.

SO ORDERED.

Dated: New York, New York
August 23, 2012

_____
J. PAUL OETKEN
United States District Judge